**FILED**

Dec 31 2020, 8:49 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

David T. Vlink
William R. Groth
Macey Swanson LLP
Indianapolis, Indiana

Cornish F. Hitchcock
Hitchcock Law Firm PLLC
Washington, District of Columbia

ATTORNEYS FOR *AMICUS CURIAE*

Daniel P. Byron
Margaret M. Christensen
S. Katie Dickey
Dentons Bingham Greenebaum LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Phillip J. Fowler
Amanda Jane Gallagher
Indiana Economic Development
Corporation
Indianapolis, Indiana

Bryan H. Babb
Bradley M. Dick
Bose McKinney & Evans LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tax Analysts, et al.,<br>*Appellants-Plaintiffs,*<br><br>v.<br><br>Indiana Economic Development<br>Corporation,<br>*Appellee-Defendant.* | December 31, 2020<br><br>Court of Appeals Case No.<br>20A-PL-1141<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable John M.T. Chavis, II,<br>Judge<br><br>Trial Court Cause No.<br>49D05-1905-PL-21582 |

**Bailey, Judge.**

# Case Summary

Tax Analysts is a non-profit publisher of periodicals relating to taxation, and Lauren Loricchio is a reporter for Tax Analysts. Tax Analysts and Lauren Loricchio (collectively, "TA") submitted to the Indiana Economic Development Corporation ("the IEDC") an Access to Public Records Act ("the APRA") request for records of the City of Indianapolis's response to Amazon's Request for Proposals ("RFP") related to the location of Amazon's future second headquarters. The IEDC denied that request on the grounds that the records were statutorily exempt from disclosure because they were created during negotiations with Amazon. TA sued the IEDC, asserting that the requested records must be disclosed as the "terms of the final offer of public financial resources" to Amazon, per Indiana Code Section 5-14-3-4(b)(5)(B). The trial court agreed with the IEDC and granted it summary judgment. The only issue on appeal is whether the trial court erred when it ruled that the records sought were exempt from disclosure under the APRA, Indiana Code Section 5-14-3-4(b)(5), because they were created during negotiations and did not include terms of a final offer of public financial resources.

We affirm.

# Facts and Procedural History

In September of 2017, Amazon announced, in an RFP, plans to build a new headquarters known as HQ2. The RFP required that confidential responses be

submitted to Amazon by October 19, 2017, and noted Amazon would make a final site selection and announcement in 2018. The RFP stated that Amazon would be hiring as many as 50,000 new full-time employees with an average annual total compensation exceeding one hundred thousand dollars over the next ten to fifteen years, following the commencement of operations. The RFP stated that the actual average wage rate may vary from the projected wage rate depending upon prevailing rates at the final location, and it noted that "[a]ll job numbers, categories, and salaries contained herein are estimates/projections and are subject to change." Appellant's App. v. II at 153.

[4] One of Amazon's key preferences and decision drivers required responders to "[i]dentify incentive programs available for the Project at the state/province and local levels [and o]utline the type of incentive (i.e. land, site preparation, tax credits/exemptions, relocation grants, workforce grants, utility incentives/grants, permitting, and fee reductions) and the amount." *Id*. at 156. The RFP also stated:

> 2. Please provide a summary of total incentives offered for the Project by the state/province and local community. In this summary, please provide a brief description of the incentive item, the timing of incentive payment/realization, and a calculation of the incentive amount.… We acknowledge a Project of this magnitude may require special incentive legislation in order for the state/province to achieve a competitive incentive proposal. As such, please indicate if any incentives or programs will require legislation or other approval methods. Ideally, your submittal includes a total value of incentives, including the specified benefit time period.

3. If any of the programs or incentives described in the summary of total incentives are uncertain or not guaranteed, please explain the factors that contribute to such uncertainty and estimate the approximate level of certainty. …

4. Please provide a timetable for incentive approvals at the state/province and local levels, including any legislative approvals that may be required.

*Id*. at 157.

[5] Regarding confidentiality, the RFP stated: "While the existence of the Project is not confidential, certain aspects of the Project and details regarding the company are confidential, proprietary, and constitute trade secrets. Amazon will deliver a Confidentiality and Non-Disclosure Agreement for execution at the appropriate time." *Id*. at 158. The RFP concluded as follows: "This RFP is only an invitation for proposals, the substance of which may be memorialized in a binding definitive agreement or agreements if any proposal is selected. Amazon may select one or more proposals and negotiate with the parties submitting such proposals before making an award decision, or it may select no proposals and enter into no agreement." *Id*.

[6] Amazon received more than 200 proposals in response to the RFP, including one from the City of Indianapolis ("the City"). The IEDC and the City contributed portions of the response (collectively, "the First Response"), and the IEDC has the portion of the First Response to which it contributed. The Indy Chamber of Commerce coordinated the submission of the full First

Response to Amazon. The First Response indicated[1] dollar amounts to which the City and the State of Indiana would commit to bring Amazon's HQ2 to the region but provided only general overviews and estimates of financial incentives. The First Response briefly described the estimated total amount of Economic Development for a Growing Economy ("EDGE") tax credits to which the State would commit and informed Amazon that the tax credits are certified on an annual basis and can last for a period up to ten years for each phase of the project. The First Response provided that the State would commit to providing a Skills Enhancement Fund for talent development programs whereby Amazon would have up to five years to use the training funds. The First Response also provided that the State would commit to providing an Industrial Development Grant to use for infrastructure improvements to support the project. The First Response detailed legislative initiatives that could be pursued for the project "if Amazon committed to a minimum capital investment and jobs number." App. v. II at 219. COO Cotterill stated by affidavit that, "[b]efore IEDC could have made an offer of economic incentives, it would have needed to know the scope of Amazon's commitment to Indiana, including jobs numbers, salaries, and capital investment." *Id*. at 220.

---

[1] TA has not objected to, offered evidence contradicting, or otherwise disagreed with the statements made in IEDC Chief Operating Officer Chris Cotterill's ("Cotterill") affidavit designated by IEDC in its cross motion for summary judgment. That affidavit summarized portions of the First Response to Amazon's RFP, App. v. II at 217-22, and the trial court found the statements made in that affidavit were undisputed facts, *id*. at 15-18.

In January 2018, Amazon announced Indianapolis was one of twenty finalist cities for its HQ2, and in March 2018 Amazon representatives visited Indianapolis to gather more information. Amazon also sent Indianapolis a Request for Information ("RFI") that included a detailed, confidential questionnaire in which Amazon sought further information about the city. The RFI stated that Indianapolis was a "candidate community" to host Amazon's HQ2. (In camera documents, RFI, p. 2).

IEDC's portion of the response to the questionnaire ("the IEDC Response") addressed only the "Real Estate" section of the Amazon questionnaire. IEDC provided two proposed sites for Amazon's HQ2 and provided some information about each of those sites. Some of the information IEDC provided was estimated costs of various fees and permits, brief discussions of planned future projects, and anticipated developments—including conditional costs and timelines—should Indianapolis be selected by Amazon. The IEDC Response also referenced an opportunity to discuss proposed future agreements that would be required regarding utilities options, including potential improvements to existing utilities. And it contained "propos[als] to offer" additional transportation. (In camera documents, the IEDC Response, Transportation sections).

The City and the IEDC did not hear from Amazon again after Amazon's visit to Indianapolis. On November 13, 2018, Amazon announced its decision to split the HQ2 project between two locations: Queens, New York and Arlington,

Virginia. Amazon also selected Nashville, Tennessee as a new logistics and transportation hub.

[10] On January 16, 2019, TA submitted to the IEDC a written public records request in which it sought the following information: (1) access to and copies of Indianapolis's proposal for Amazon's HQ2 project; (2) all records related to the cost of the proposal, including receipts and memos; and (3) emails between Holly Sullivan of Amazon and representatives of the IEDC between the dates of October 19, 2017 and November 13, 2018. On January 23, the IEDC sent to TA a written response in which it denied the request for the records on the grounds that they were exempt from disclosure as negotiation documents, pursuant to state law.

[11] On February 6, 2019, TA filed a complaint with the Indiana Public Access Counselor ("PAC"), and the IEDC filed a response. In April 2019, the PAC issued an Opinion in which it upheld the IEDC'S decision to withhold the records on the grounds that they were created during negotiations with Amazon. With respect to the proposal and the "final offer" statutory language, the PAC stated:

> Therefore in regard to finality, it is unclear whether the General Assembly intended the bid/proposal/offer in sub-section (b)(5) to be an offer in an imminent deal—something closer to a best and final offer, inferring an element of relative permanence—or if "final offer" was intended to include any and all "last" offers as in a sequential order. As there is no case law on the matter, it is equally unclear how a court would define the term.

*  *  *

> Without judicial precedent or interpretation, enough contextual ambiguity in the statute exists to defer on this Office's drawing of a definitive conclusion or even making a recommendation in this instance.

*  *  *

> Although the proposal that IEDC submitted on behalf of the City of Indianapolis arguably communicates the terms of an offer of public financial resources, this [O]ffice is not privy to the contents of the proposal and there is no authority defining finality; and thus, [this Office] declines to conclude, without more, that a violation [of APRA] occurred.

Appellant's App. v. II at 125-27.

[12]  On May 29, 2019, TA filed with the Marion County Superior Court a complaint in which it alleged that the IEDC violated the APRA by declining to produce the requested records. The parties filed cross-motions for summary judgment. The IEDC's motion included Cotterill's affidavit, which purported to summarize the IEDC's portion of the initial response to Amazon's RFP but did not summarize the IEDC's response to Amazon's questionnaire.

[13]  On February 18, 2020, the trial court heard arguments on the cross-motions. In an order dated April 24, 2020, the trial court denied TA's motion for summary judgment and granted the IEDC's cross-motion for summary judgment on the grounds that the requested documents were negotiation documents and not a disclosable final offer under the APRA. The court also ordered the IEDC to

tender to it the detailed, confidential questionnaire from Amazon and the IEDC's response so those documents could be reviewed in camera. Following in camera review, the trial court issued an Entry of Judgment on June 8, 2020, in which it noted that it had reviewed the relevant documents in camera, and they were "protected documents created while negotiations were in progress." *Id.* at 11. The trial court entered judgment for the IEDC. This appeal ensued.

[14] On appeal, TA requested that this Court review in camera the same documents that the trial court reviewed in camera, i.e., the RFI and the questionnaire from Amazon and the IEDC's response. We granted that motion and have reviewed the documents in camera.

# Discussion and Decision

[15] TA appeals from a decision granting summary judgment to the IEDC on TA's claim that the IEDC's denial of the requested records violated the APRA. A trial court reviews such a denial de novo, "with the burden of proof on the public agency to sustain its denial" of the APRA request. Ind. Code § 5-14-3-9(f). Summary judgment is appropriate where the designated evidence "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). We review the trial court's decision on summary judgment de novo, and we may affirm it on any basis supported by the designated evidence. *See e.g., Cruz v. New Centaur, LLC*, 150 N.E.3d 1051, 1055 (Ind. Ct. App. 2020). We also apply a de novo standard of review to the trial court's interpretation of the APRA. *See, e.g.,*

*Hammond Dev. Corp. v. McDermott*, 783 N.E.2d 727, 729 (Ind. Ct. App. 2003), *trans. denied*.

[16]　TA requested from the IEDC records of Indianapolis's response to Amazon's RFP regarding the future location of its HQ2 project.[2]  The APRA provides that "[a]ny person may inspect and copy the public records of any public agency."  I.C. § 5-14-3-3.  The policy behind the APRA is that "all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees."  I.C. § 5-14-3-1.  The APRA is to be construed liberally to further that policy, and the "burden of proof for the nondisclosure of a public record [is] on the public agency that would deny access to the record and not on the person seeking to inspect and copy the record."  *Id.*

[17]　However, the APRA specifically exempts certain public records from the disclosure requirements.  At issue here is the discretionary[3] exemption for the disclosure of public records relating to negotiations.  Indiana Code Section 5-14-3-4(b)(5) states, in relevant part:

> (b) Except as otherwise provided by subsection (a), the following public records shall be excepted from section 3 of this chapter at the discretion of a public agency:

---

[2] The trial court noted—and the parties do not dispute—that the records requested by TA included both the First Response to the RFP and the IEDC's subsequent response to the confidential questionnaire.

[3] Certain records—not at issue here—are mandatorily exempt from disclosure.  I.C. § 5-14-3-4(a).

\* \* \*

(5) The following:

> (A) Records relating to negotiations between:
>
>> (i) the Indiana economic development corporation;…
>
> with industrial, research, or commercial prospects, if the records are created while negotiations are in progress….
>
> (B) Notwithstanding clause (A), the terms of the final offer of public financial resources communicated by the Indiana economic development corporation,… to an industrial, a research, or a commercial prospect shall be available for inspection and copying under section 3 of this chapter after negotiations with that prospect have terminated.
>
> (C) When disclosing a final offer under clause (B), the Indiana economic development corporation shall certify that the information being disclosed accurately and completely represents the terms of the final offer.
>
> (D) Notwithstanding clause (A), an incentive agreement with an incentive recipient shall be available for inspection and copying under section 3 of this chapter after the date the incentive recipient and the Indiana economic development corporation execute the incentive agreement regardless of

> whether negotiations are in progress with the recipient after that date regarding a modification or extension of the incentive agreement.

[18] The IEDC asserts that it has discretion not to disclose the records TA requested because, pursuant to (b)(5)(A), those records were "created while negotiations were in progress" between it and Amazon, a "commercial prospect." However, TA maintains that the records must be disclosed under (b)(5)(B) because they contain the "terms of the final offer of public financial resources" communicated by the IEDC to Amazon. There is no dispute that the records were created during negotiations between the IEDC and Amazon. The issue on appeal is whether the records were a *final offer* and therefore subject to disclosure under subsection (b)(5)(B) despite the fact that they were created during negotiations.

[19] When we interpret a statute, "the first step is to determine whether the Legislature has spoken clearly and unambiguously on the point in question. When a statute is clear and unambiguous, we apply words and phrases in their plain, ordinary, and usual sense." *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015). Unfortunately, the APRA does not define the term "final offer." And, as the PAC[4] noted, the statute is ambiguous regarding the meaning of that term in subsection (b)(5)(B). That is, the statute does not clearly state whether "an

---

[4] PAC decisions are not binding; rather, they are "advisory opinions to interpret the public access laws" at the request of a person or public agency. I.C. § 5-14-4-10(6). However, upon conducting our own de novo review of the statute, we agree with the PAC that the term "final" in the statute is ambiguous.

offer is 'final' when it is an offer in an imminent deal—something closer to a best and final offer, inferring an element of relative permanence—or if 'final offer' was intended to include any and all 'last' offers as in a sequential order." Appellant's App. v. II at 125.

[20] When we are faced with an ambiguous statute, "our primary goal is to determine, give effect to, and implement the intent of the Legislature with well-established rules of statutory construction." *Anderson*, 42 N.E.3d at 85.

> We avoid interpretations that depend on [a] selective reading of individual words that lead to irrational and disharmonizing results. As we interpret the statute, we are mindful of both what it does say and what it does not say. To the extent there is an ambiguity, we determine and give effect to the intent of the legislature as best it can be ascertained. We do not presume that the [l]egislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result.

*ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016) (quotations and citations omitted). In addition, the legislative intent behind a statute "may be identified and effectuated by examining the act as a whole, the law existing before its passage, changes made to the law since enactment and the reasons for those changes." *Miller Brewing Co. v. Bartholomew Cnty. Beverage Co., Inc.*, 674 N.E.2d 193, 205 (Ind. Ct. App. 1996), *trans. denied*; *see also Von Tobel Corp. v. Chi-Tec Const. & Remodeling, Inc.*, 994 N.E.2d 1215, 1218 (Ind. Ct. App. 2013) (citations omitted) (noting, where meaning is uncertain, "the courts will look also to the situation and circumstances under which [the statute] was enacted").

In interpreting the APRA specifically, we apply a presumption in favor of disclosure, given the Act's public purpose of promoting government transparency. *Evansville Courier & Press v. Vanderburgh Cnty. Health Dep't*, 17 N.E.2d 922, 929 (Ind. 2014). However, the APRA's disclosure requirements "do[] not mean that expressed exceptions specified by the legislature are to be contravened." *Robinson v. Ind. Univ.*, 659 N.E.2d 153, 156 (Ind. Ct. App. 1995) (quotation and citation omitted), *trans. denied*.

We begin by examining the language of the statute itself, as that is the best evidence of the legislature's intent, and all words must be given their plain and ordinary meaning unless otherwise indicated by the statute. *E.g., Hendrix v. State*, 759 N.E.2d 1045, 1047 (Ind. 2001). Although the statute does not define the term "final offer," the dictionary definition of "final" is: (1) not to be altered or undone; (2) coming at the end: being the last in a series, process, or progress; (3) of or relating to the ultimate purpose or result of a process. *Final*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/final. The relevant dictionary definition of "offer" as a noun is: (1) a presenting of something for acceptance; (2) an undertaking to do an act or give something on condition that the party to whom the proposal is made do some specified act or make a return promise." *Offer*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/offer.

We can narrow the definition of "final offer" further by examining the history of Indiana Code Section 5-14-3-4(b)(5). That history indicates a legislative concern for keeping private the negotiations between public agencies and

industrial, research, and commercial prospects, despite the overarching purpose of the APRA. Until 1991, subsection (b)(5) did not contain clauses (A) through (D). Rather, it defined exempt negotiation records as: "(5) Records relating to negotiations between the department of commerce, … with industrial, research, or commercial prospects *while negotiations are in progress*." I.C. § 5-14-3-4(b)(5) (2019) (emphasis added). Sometime in 1990 or early 1991, State Representative Patrick Kiely asked the Indiana Attorney General ("AG") to issue an opinion regarding "whether a financial incentive package offered by the Indiana Department of Commerce [now IEDC] becomes available for public inspection after the termination of negotiations between the Department and a commercial prospect." 1991 Op.Atty.Gen. No. 91-4, 1991 WL 495534, *1 (March 6, 1991). The AG concluded: "Indiana Code Section 5-14-3-4(b)(5) makes it clear that the exception from disclosure authorized by that provision only exists 'while negotiations are in progress.' When negotiations with a prospect have been completed, the records relating to the negotiations become available for public inspection unless another exception applies." *Id*. at *2.

[24] In the next legislative session following the issuance of the AG's opinion, the legislature amended subsection (b)(5) by adding clauses (A) through (C). Clause (A) was the same as the former statute except that it added that records were exempt not just "while negotiations are in progress" but "*if the records are created* while negotiations are in progress." 1991 Ind. Legis. Serv. P.L. 50-1991 (H.E.A. 1982) (Approved May 12, 1991). That change indicates that the legislature no longer wished for all records of negotiations between the IEDC

and commercial prospects to be available to the public after negotiations had concluded, as the former statute provided. *Id.* Rather, under the new language of clause (A), records could be excluded from disclosure, at the agency's discretion, when those records *were created* during negotiations. *Id.* However, the 1991 amendment adding clause (B) also evinces the legislature's clear intent that those same records protected under subparagraph (A) must be disclosed when they are comprised of "the terms of a final offer of public financial resources."[5]

[25] Thus, the legislature purposely changed the statute from requiring disclosure of all records of negotiations after negotiations concluded to only requiring disclosure under the limited circumstances where negotiations resulted in the terms of final offers (or, later, incentive agreements). We can logically infer from those statutory changes that the legislature envisioned that there would be some situations in which negotiations did *not* result in a disclosable "final offer" or incentive agreement, and that records of those negotiations could be withheld by the public agency under clause (A).[6] Therefore, "final offer" must mean something more than simply the last offer in a sequence of negotiations,

---

[5] The legislature subsequently added clause (D), which requires disclosure of an "incentive agreement." I.C. § 5-14-3-4(b)(5)(D). No one contends that the records at issue in this case are an incentive agreement that must be disclosed under clause (D). For that reason, we note that the IEDC's discussion of terms statutorily required for an incentive agreement are irrelevant. *See, e.g.*, Appellee's Br. at 33-34 (citing I.C. 6-3.1-13-19, which requires the IEDC to enter into an "agreement" with specified terms when an applicant "is awarded" tax credits).

[6] We further note that, if the legislature meant simply the "last" offer in the negotiations, it could have easily said "last" instead of "final" in subparagraph (b)(5)(B). *See ESPN, Inc.*, 62 N.E.3d at 1195 (noting we must be mindful of both what a statute does say and what it does not say).

or "coming at the end: being the last in a series, process, or progress."[7] *Final*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/final. For the same reasons, "final offer" must also mean something more than "of or relating to the ultimate purpose or result of a process" as that frequently, if not always, would include all negotiations. *Id*.

[26] We are left with the "not to be altered or undone" dictionary definition of "final." *Final*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/final. That definition is consistent with the language of Indiana Code Section 5-14-3-4(b)(5) and its history, as noted above.[8] It is also consistent with the public policies behind clauses (A) and (B) and the purpose of the APRA. That is, clause (A) recognizes that economic development negotiation records must be protected to enable Indiana to compete for jobs and investments without tipping off Indiana's competition or future prospects and thereby giving either an advantage. *See also* I.C. § 5-28-1-1 (noting that the purpose of the IEDC is to maximize Indiana's economic development efforts and providing that IEDC has broad powers to do so). On the other hand, clause (B) recognizes that citizens have a right to know how the

---

[7] The trial court concluded that records constitute a "final offer" only when they are certified under clause (C). We disagree. Clause (B) presupposes that there may be such a thing as a "final offer of public financial resources" and, when there is, it must be disclosed. Clause (C) only relates to the requirements the public agency must meet when it discloses an already-existing final offer; that is, "*when disclosing* a final offer," it must certify its accuracy and completeness. I.C. § 5-14-3-4(b)(5)(C) (emphasis added). Under the plain language of the statute, the certification comes after the existence of the final offer; it does not create the final offer.

[8] Thus, we need not consider how "final offer" is used in other statutes or in contract law, as the IEDC suggests.

government ultimately has committed to using their taxpayer dollars. *See also* I.C. § 5-14-3-1 (stating the public policy behind APRA). Thus, records relating to negotiations are not disclosable under Indiana Code Section 5-14-3-4(b)(5)(B) unless they contain the terms of an offer that, if accepted, would commit public financial resources; that is, the offer must be final in the sense that it is not intended to be altered or undone in future negotiations.

[27] To determine if an offer is intended to be altered or undone in the future, we consider the language used in the offer. Logically, language that is conditional, tentative, indefinite, provisionary, or conjectural would be evidence that the offer is to be altered or changed at some point and, therefore, not final. Amazon's RFP, RFI, and questionnaire and the IEDC's Responses contain such language. The RFP specifically stated that it was merely an "invitation for proposals, the substance of which may be memorialized in a binding definitive agreement or agreements if any proposal is selected." Appellant's App. v. II at 158. It also stated that the jobs and salaries it contained were "estimates/projections" that were "subject to change." *Id*. at 153. The First Response to that RFP provided "only general overviews of incentives" it could provide to Amazon if Indianapolis were chosen for its HQ2. *Id*. at 16.

[28] Amazon's subsequent RFI to Indianapolis stated that it was "invit[ing]" Indianapolis, as a "candidate community to host HQ2," to respond to the attached questionnaire. (In Camera documents, RFI, p. 2). The RFI did not specify job numbers, salaries, or capital investments in any more detail than the RFP had—a condition Cotterill said must be met before Indianapolis could

offer a final proposal. And the IEDC's response to the questionnaire proposed two different project sites, not one final site. Moreover, the language used in each site proposal also contained a lack of finality. For each site, the IEDC provided estimates of various costs, and it noted that the final costs would be dependent upon facts existing in the future, such as the size of the HQ2 building. The IEDC Response also discussed potential future agreements, projects, developments, and timelines that would be dependent upon which Indianapolis location Amazon chose for its site and/or what the HQ2 would look like. Such conditional language is evidence that the two site offers in the IEDC Response were to be altered—and one of them "undone"—in the future if Amazon chose Indianapolis for its HQ2.

[29]    We hold that the IEDC's responses to both Amazon's initial RFP and its subsequent RFI and questionnaire were parts of on-going negotiations with Amazon that had not developed yet into "terms of the final offer of public financial resources." I.C. § 5-14-3-4(b)(5)(A), (B). As such, the IEDC had discretion to deny TA's request for copies of those records. *Id*.

# Conclusion

[30]    Because the IEDC Response to Amazon consisted of records of negotiations and not a final offer of public financial resources, the APRA did not require the IEDC to disclose it to the public. The trial court's orders denying summary judgment to TA and granting IEDC's cross-motion for summary judgment were not erroneous.

Affirmed.

Robb, J., and Tavitas, J., concur.